# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| SCION DWIGHT MANAGING MEMBER LLC, an Illinois limited liability company, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 10 C 6118 |
| v. | ) ) | Judge Ronald A. Guzmán |
| DWIGHT LOFTS HOLDINGS, LLC, A Delaware limited liability company, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Scion Dwight Managing Member LLC ("Scion") has sued Dwight Lofts Holdings, LLC for, among other things, breach of contract, and defendant has countersued plaintiff for reformation. The case is before the Court on Scion's Federal Rule of Civil Procedure ("Rule") 56 motion for summary judgment as to these two claims. For the reasons set forth below, the Court denies the motion.

## Facts

Between late 2006 and 2008, Scion and various investment funds advised by ASB Capital Management, LLC (collectively "ASB" or "Fund") entered into five real estate joint ventures in the form of LLCs called University Crossing, Millennium, Breckenridge, 2040 Lofts and defendant Dwight Lofts Holdings, LLC. (Def.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 1, 4-5.) Robert ("Rob") Bronstein, a principal and president of Scion, and his brother Eric Bronstein, a principal of and in-house counsel for Scion, negotiated the ventures on behalf of Scion. (*Id.* ¶ 7.) Keyvan Arjomand, then a representative of ASB, attorneys Cara Nelson and Barbara Trachtenberg of DLA Piper, the law

firm that represented ASB, and Robert Bellinger, president of ASB, negotiated the ventures on behalf of ASB. (*Id.*)

The LLC Agreement for the first venture, University Crossing: (1) names Scion as the managing or venture member and ASB as the investor or fund member; (2) states that ASB will pay Scion an acquisition fee of $150,000.00 when the venture obtains title to the real estate; (3) a Scion affiliate will manage the property and be paid a fee for doing so equal to five percent basis points of the real estate's purchase price; and (4) beginning a year after the purchase, ASB has an absolute right to buy from Scion and Scion has an absolute right to sell to ASB Scion's interest in the venture ("put/call provision"). (*See* Barnett Aff., Ex. G, University Crossing LLC Agreement, Preamble, §§ 1.1, 5.4, 5.6.2, 6.4.) The Agreement also contains a Sale Proceeds Waterfall Provision, which states that the proceeds of a sale or refinancing will be distributed so that each member's invested capital is returned before Scion is paid a promote percentage, *i.e.*, a percentage of the proceeds in excess of its interest in the venture, as follows:

> *First*, among the Members in proportion to the Unrecovered Voluntary Additional Capital Contributions of each of the Members at such time, until such time as each Member's Unrecovered Voluntary Additional Capital Contribution has been reduced to zero;
>
> *Second*, among the Members, in proportion to the Unrecovered 8% Preferred Return Amounts of the Members at such time, until such time as each Member's Unrecovered 8% Preferred Return Amount has been reduced to zero;
>
> *Third*, among the Members in proportion to the Invested Capital of the Members at such time, until such time as each Member's Invested Capital has been reduced to zero;
>
> *Fourth*, (x) the Remaining Percentage to the Members in proportion to their respective Percentage Interests at such time, and (y) the Promote Percentage to Venture Partner.

(*Id.* § 4.2 ("Sale Proceeds Waterfall" or "Provision").)

During negotiations for the second venture, Millennium, ASB wanted to reduce the property management fee and eliminate the acquisition fee, neither of which Scion wanted to do. (*See* Pl.'s LR 56.1(a) Stmt., Ex. 9, Emails from Arjomand to E. & R. Bronstein & from R. Bronstein to Arjomand (Mar. 7, 2007); *id.*, Email from R. Bronstein to Arjomand (Mar. 8, 2007); *id.*, Ex. 8, Email from Nelson to E. & R. Bronstein (Mar. 7, 2007); *id.*, Email from E. Bronstein to Nelson (Mar. 8, 2007).) On March 21, 2007, Arjomand suggested a possible solution:

> . . . [M]y sense is that . . . Robert [Bellinger, president of ASB] is ok with . . . an acquisition fee . . . [but is] stuck on the say $150K as a max acquisition fee, . . . [and] struggles with the portion of the upfront fee that Scion needs to put its people to work on a new project, etc.; however, if you're open to it we might be able to address [sic] potentially through a higher property management fee and/or promote structure on deals. My sense is that the couple hundred thousand on Millennium that will go to Scion to cover costs, etc [sic] upfront . . . , Robert [Bellinger] would feel more comfortable paying you a higher property management fee and/or promote instead.

(*Id.*, Ex. 10, Email from Arjomand to E. & R. Bronstein (Mar. 21, 2007).)

Based on this suggestion, Rob Bronstein proposed that the Sale Proceeds Waterfall in future LLC Agreements contain two levels of promote rather than the single level that appeared in the University Crossing Agreement. Specifically, Rob "propose[d] . . . for all future projects except where [the parties] mutually agree on alternate terms" that Scion would: (1) "receive an acquisition fee calculated as .075% of the purchase price [of the real estate] , capped at $150,000 and paid at the time of closing;" (2) "be paid a property management fee calculated as 5.0% of the gross project revenue on the first 250 units of any single project, and 4.0% of revenue on all units above 250"; and (3) "continue to co-invest 0.5% of required equity . . . with the ASB Fund, earning *pari passu* returns up to a threshold of 8.0% annual cumulative return[,] [o]nce the 8.0% return has been achieved, Scion [would] receive 25% of proceeds (75% to the Fund) until the Fund realizes a 12.0% cumulative return, above which Scion [would] receive 50% of proceeds (50% to the Fund)." (*See*

3

Barnett Aff., Ex. S, Mem. from R. Bronstein to Bellinger & Arjomand (Mar. 30, 2007).) Rob's proposal says nothing about the order in which sale proceeds would be distributed under the new provision, *i.e.*, whether invested capital would be returned before or after payment of one or both levels of promote. (*Id.*)

On April 6, 2007, the parties executed the Millennium LLC Agreement. (*See id.*, Ex. O, Millennium LLC Agreement.) The Millennium Agreement contains the same provisions as the University Crossing Agreement, including the Sale Proceeds Waterfall, but increases Scion's acquisition fee from $150,000.00 to $400,000.00. (*See id.*, Preamble, §§ 1.1, 4.2, 5.4, 5.6.2, 6.4.)

On April 24, 2007, Rob Bronstein emailed ASB president Bellinger the following:

> I have spoken to Keyvan who relayed your JV terms, and think we are very close to finalizing this.
>
> In terms of the acquisition fee (0.75% of the purchase price not to exceed $150,000), we are in agreement. The same is true for the management fee (5% of the first 500 beds of any single project, 4% thereafter) . . . .
>
> Therefore, the only remaining issue is the promotes. We proposed 24% above and 8% preferred return and 50% above 12%. You countered with 20% above 8% and 30% above 12% on un-levered projects and 20% above 9% and 30% above 15% on levered projects. We are willing to accept 25% and 35% (instead of your 20% and 30%) . . . .
>
> So, in sum, if you are in agreement to raise the 20% to 25% and the 30% to 35%, we have a deal.

(Barnett Aff., Ex. T, Email from R. Bronstein to Bellinger (Apr. 24, 2007).) The email says nothing about the order in which sale proceeds will be paid out. (*Id.*)

On May 9, 2007, ASB's Arjomand sent the following to the Bronsteins:

> . . . [T]o recap our recent discussions on ASB/Scion JV business terms on go forward deals, the following is a summary of what I believe both sides have agreed to. Please let me know if this matches your understanding.

4

> **Acquisition fee to Scion** – 75 basis points of purchase price but capped at $150,000
>
> **Property mgmt fee** – Scion to receive 5% of gross income on first 500 beds at a property, and 4% on all beds over 500 at a property. So property management fee on a 1,000 bed property would equal 4.5%.
>
> . . . .
>
> **Promote** – On an unlevered deal, 20% over an 8%, and 35% over a 12%. On a levered deal, 20% over a 9%, and 35% over a 15%.

(Pl.'s LR 56.1(a) Stmt., Ex. 11, Email from Arjomand to R. Bronstein (May 9, 2007).) The email says nothing abut the order in which the proceeds will be paid out. (*Id.*)

A few weeks later, Arjomand sent the May 9, 2007 email to Bellinger and ASB's lawyers Nelson and Trachtenberg, saying: "Please save this email for future reference. [It contains] the basic economics of our deal format with Scion on a go forward basis, that conforms to our recently negotiated terms." (*Id.*, Email from Arjomand to Bellinger (May 22, 2007).)

On June 15, 2007, ASB attorney Nelson sent the Bronsteins a draft of the Breckenridge LLC Agreement "reflecting Eric [Bronstein]'s comments" on a prior draft, which are not in the record. (Pl.'s LR 56.1(a) Stmt., Ex. 15, Email to E. & R. Bronstein from Nelson (June 15, 2007).) Unlike the Sale Proceeds Waterfall in the University Crossing and Millennium LLC Agreements, the one that appears in this draft agreement contemplates that the promote will be paid before the Members' invested capital is returned:

> *First*, among the Members in proportion to the Unrecovered Voluntary Additional Capital Contributions of each of the Members at such time, until such time as each Member's Unrecovered Voluntary Additional Capital Contribution has been reduced to zero;
>
> *Second*, among the Members, in proportion to the Unrecovered 8% Preferred Return Amounts of the Members at such time, until such time as each Member's Unrecovered 8% Preferred Return Amount has been reduced to zero;

> *Third*, (x) Remaining Percentage to the Members in proportion to each Member's respective Percentage Interest at such time, and (y) the Promote Percentage to Venture Partner until such time as each Member's Unrecovered 12% Preferred Return Amount has been reduced to zero; and
>
> *Fourth*, among the Members in proportion to the Invested Capital of the Members at such time, until such time as each Member's Invested Capital has been reduced to zero;
>
> *Fifth*, (x) the Remaining Percentage to the Members in proportion to their respective Percentage Interests at such time, and (y) the Promote Percentage to Venture Partner.

(*Id.*, Draft Breckenridge LLC Agreement § 4.2 (June 15, 2007).)

On June 19, 2007, Eric Bronstein proposed that the last clause of the "*Third*" paragraph in the Provision be changed from: "(y) the Promote Percentage to the Venture Partner until such time as **each Member's** Unrecovered 12% Preferred Return Amount has been reduced to zero;" to "(y) the Promote Percentage to the Venture Partner until such time as **the Fund's** Unrecovered Second Preferred Return Amount has been reduced to zero." (Barnett Aff., Ex. LL, Email from E. Bronstein to Nelson (June 19, 2007)) (emphasis added). He explained the change to Nelson this way:

> [O]nce we achieve the First Preferred Return threshold and before the Second Preferred Return is reached, Scion will be receiving its promote percentage in addition to its pro-rata (1%) percentage. This means that Scion would achieve its own "Second Preferred Return" (12-15%) before the time that the Fund does. But Scion achieving the Second threshold doesn't matter; rather, the test for the next split level (65/35) is whether the Fund achieves the higher preferred return. Therefore, I edited the language about "each Member" achieving the Second Preferred Return and changed it to "the Fund" achieving this return.

(*Id.*) Eric did not comment on or ask that a change be made to the new order of payments reflected in the draft. (*Id.*)

Later that day, ASB attorney Nelson told Eric that the change was "fine." (Pl.'s LR 56.1(a) Stmt., Ex. 17, Email to E. Bronstein from Nelson (June 19, 2007); *see* Def.'s LR 56.1(b)(3)(B) Stmt.

¶ 25.) The Sale Waterfall Proceeds Provision as it appears in the executed Breckenridge LLC Agreement states:

> *First*, among the Members in proportion to the Unrecovered Voluntary Additional Capital Contributions of each of the Members at such time, until such time as each Member's Unrecovered Voluntary Additional Capital Contribution has been reduced to zero;
>
> *Second*, among the Members, in proportion to the Unrecovered First Preferred Return Amounts of the Members at such time, until such time as each Member's Unrecovered First Preferred Return Amount has been reduced to zero;
>
> *Third*, (x) the Remaining Percentage to the Members in proportion to each Member's respective Percentage Interest at such time, and (y) the Promote Percentage to Venture Partner until such time as the Fund's Unrecovered Second Preferred Return Amount has been reduced to zero; and
>
> *Fourth*, among the Members in proportion to the Invested Capital of the Members at such time, until such time as each Member's Invested Capital has been reduced to zero;
>
> *Fifth*, (x) the Remaining Percentage to the Members in proportion to their respective Percentage Interests at such time, and (y) the Promote Percentage to Venture Partner.

(Barnett Aff., Ex. H, Breckenridge LLC Agreement § 4.2.) There is no evidence that suggests ASB or its counsel remarked on or objected to the Sale Proceeds Waterfall Provision.

In July 2007, the parties negotiated the 2040 Lofts venture. (Def.'s LR 56.1(b)(3)(B) Stmt. ¶ 27.) The 2040 Lofts LLC Agreement was based on the Breckenridge LLC Agreement and contained the same Sales Proceeds Waterfall Provision with the addition of the specific percentages that constituted the parties' preferred returns. (*Id.* ¶ 28; *see* Pl.'s LR 56.1(a) Stmt., Ex. 19, Email from Nelson to R. Bronstein (July 5, 2007) & enclosed draft 2040 Lofts LLC Agreement § 4.2; *id.*, Ex. 23, Executed 2040 Lofts LLC Agreement § 4.2.) There is no evidence that suggests ASB or its counsel remarked on or objected to the Sale Proceeds Waterfall Provision.

Effective October 29, 2007, the parties amended and restated the Breckenridge LLC Agreement. (Def.'s LR 56.1(b)(3)(B) Stmt. ¶ 33.) The Sale Proceeds Waterfall Provision in the restated agreement is identical to the one in the original Breckenridge LLC Agreement. (*See* Barnett Aff., Ex. I, Am. & Restated Breckenridge LLC Agreement § 4.2.) Again, there is no evidence that ASB or its counsel commented on or objected to the Provision.

In early 2008, the parties negotiated the venture at issue in this case, Dwight Lofts. (Def.'s LR 56.1(b)(3)(B) Stmt. ¶ 35.) The Dwight Lofts LLC Agreement was also based on the Breckenridge LLC Agreement and, with exception of referring to the Fund as the "Fund Member," contains the same Sale Proceeds Waterfall Provision. (*See* Pl.'s LR 56.1(a) Stmt., Ex. 27, Email from Nelson to R. & E. Bronstein (Jan. 14, 2008) & enclosed draft Dwight Lofts LLC Agreement § 4.2; Barnett Aff., Ex. J, Dwight Lofts LLC Agreement § 4.2.) Once again, the Sale Proceeds Waterfall Provision occasioned no remark from ASB or its counsel.

In March 2010, Scion exercised its rights pursuant to the LLC Agreements' put/call provisions to sell its interests in 2040 Lofts and Dwight Lofts to ASB. (Def.'s LR 56.1(b)(3)(B) Stmt. ¶ 52.) When the Bronsteins gave ASB their calculation of the buy-out amount for Scion's interest in 2040 Lofts, James Darcy of ASB replied:

> I'm confused. Does your calculation suggest that Venture Partner (Scion) is due $1.8 million? It seems odd to me that an investment into which we have together invested over $47 million and which is now valued at $35.5 million would generate a promote. We are reviewing the language, but does that make sense to you? Logic suggests the Scion payout should be 1% of $35.5 million.

(Barnett Aff, Ex. Y, Email from Darcy to E. Bronstein (Aug. 30, 2010).)

Rob Bronstein replied:

> Yes, this was the business deal we negotiated through Keyvan Arjomand in 2007. It was different than the [University Crossing] and Millennium structure, for several

reasons – we brought ASB an off-market deal, our acquisition fee was reduced, we left our proceeds in but still had to pay capital gains tax, our management fee was lowered, etc. Therefore our deal was structured with more back-end compensation.

(*Id.*, Email from R. Bronstein to Darcy (Aug. 30, 2010).)

In September 2010, Bellinger wrote to Rob Bronstein:

. . . [W]e have reviewed the [Sale Proceeds Waterfall] language in the [2040 Lofts LLC] Agreement . . . which is used to determine the purchase price for Scion's interest. We have also reviewed the manner in which that language came to be drafted. We have concluded that the Sale Proceeds Waterfall contains a fundamental mistake, which is to place the payment of the first-level promote (a disproportionate distribution of proceeds to the Managing Member, Scion) prior to the return of capital. As in [our] first two ventures . . . , the parties intended in the 2040 Lofts deal (and the other subsequent ventures) that invested capital would be returned to members prior to Scion's receipt of promote. To correct the mistake the third and fourth levels of the Sales Proceeds Waterfall in the Agreement must be reversed. . . .

We have also concluded that the same mistake is present in the Sale Proceeds Waterfall of the [LLC Agreements for Breckenridge and Dwight Lofts] . . . . Accordingly, ASB requests that Scion agree to make the necessary amendments to [these Agreements] so that the Sale Proceeds Waterfall in each reflects the agreed-upon sequence of distributions.

. . . .

It is inconceivable that ASB and Scion would have agreed to make a change to their previous agreement as significant as providing for a promote before the return of capital without the matter ever being discussed between the parties or even requested by Scion. I know that the Fund Member entered into the Breckenridge, 2040 Lofts and Dwight Lofts Agreements under the mistaken understanding that the agreements would provide for a return of capital prior to the payment of a promote in the event of a sale. Scion . . . [was] either unaware of the mistake . . . or [was] aware of the mistake and purposefully kept silent to take advantage of it. . . .

(Pl.'s LR 56.1(a) Stmt., Ex. 40, Letter From Bellinger to R. Bronstein (Sept. 30, 2010).)

Thereafter, Scion filed this suit against defendant for breach of the Dwight Lofts LLC Agreement and subsequently amended the complaint to add claims for breach of fiduciary duty and breach of the covenant of good faith and fair dealing. In response, defendant asserted a counterclaim

9

for contract reformation on the grounds of mutual mistake or unilateral mistake coupled with knowing silence.

**Discussion**

To prevail on its motion with respect to its contract claim and defendant's counterclaim for reformation, Scion must show that the record, viewed favorably to defendant, supports only one inference – that the parties agreed to the Sale Proceeds Waterfall Provision that appears in the Dwight Lofts Agreement. *See* Fed. R. Civ. P. 56(a); *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000) (stating that courts view all evidence and draw all inferences in favor of the party opposing a summary judgment motion and will grant the motion only if no reasonable jury could find for the non-movant); *Patterson-Woods & Assocs., LLC v. Realty Enters., LLC*, No. 05C-01-224-JOH, 2008 WL 2231511, at *4 (Del. Super. Ct. May 21, 2008) (stating that a contract claim requires proof of "the existence of a valid contract"); *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1151-52 (Del. 2002) (stating that a contract reformation claim requires proof that "the parties came to a specific prior understanding that differed materially from the written agreement").[1] Viewed favorably to defendant the record shows that: (1) the parties agreed that the LLC Agreement for Breckenridge and any succeeding joint ventures would contain a two-tiered Sale Proceeds Waterfall, rather than the single-tiered provision set forth in the University Crossing and Millennium Agreements; (2) the people who negotiated the two-tiered Provision do not recall discussing the order in which the pay outs would be made, and the subject is not addressed

---

[1] The Dwight Lofts LLC Agreement has a Delaware choice-of-law provision. (*See* Barnett Aff., Ex. J, Dwight Lofts LLC Agreement § 9.5.)

in the contemporaneous documents; (3) the May 9, 2007 email from ASB's Arjomand to the Bronsteins setting forth the economic terms for "go forward deals" does not specify the order of pay outs; (4) the draft of the Breckenridge LLC Agreement in which the contested Provision first appeared was prepared by ASB's law firm but, lawyers Nelson and Trachtenberg do not remember making the change, Nelson says she did not grasp the significance of the change and Trachtenberg says she did not even realize the change had been made until years later; (5) Scion's Eric Bronstein says he realized the change had been made but thought ASB agreed to it because it was added to the Agreement by ASB's lawyers; (6) Trachtenberg says she knew, from working with ASB, that it would not pay a promote before the return of capital but does not know whether anyone conveyed that information to Scion; and (7) ASB and its lawyers reviewed and executed the Breckenridge LLC Agreement, the Restated and Amended Breckenridge LLC Agreement, the 2040 Lofts LLC Agreement and the Dwight Lofts LLC Agreement, all of which contain the contested Sale Proceeds Waterfall, without commenting on or objecting to the Provision. (*See* Barnett Aff., Ex. A, Arjomand Dep. 188; *id.*, Ex. C, E. Bronstein Dep. 52-53, 101-05, 115, 136-38, 140, 146-48, 187-88; *id.*, Ex. D, R. Bronstein Dep. 135, 178-79, 241, 346; *id.*, Ex. E, Nelson Dep. 71, 106-07, 134-38; *id.*, Ex. F, Trachtenberg Dep. 77-79, 97-99, 145-56; *id.*, Ex. T, Email from R. Bronstein to Bellinger (Apr. 24, 2007); *id.*, Ex. LL, Email from E. Bronstein to Nelson (June 19, 2007); Pl.'s LR 56.1(a) Stmt., Ex. 10, Email from Arjomand to E. & R. Bronstein (Mar. 21, 2007); *id.*, Ex. 11, Email from Arjomand to R. Bronstein (May 9, 2007); *id.*, Ex. 15, Email to E. & R. Bronstein from Nelson (June 15, 2007); *id.*, Ex. 17, Email to E. Bronstein from Nelson (June 19, 2007).) Given the evidence, the determination as to what agreement, if any, the parties reached as to the Sale Proceeds Waterfall Provision will have to be made at trial.

## Conclusion

For the reasons set forth above, the Court denies plaintiff's motion for partial summary judgment [64].

**SO ORDERED.**                    **ENTERED: May 17, 2012**

_____
**HON. RONALD A. GUZMAN**
**United States District Judge**